In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1690

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CALVIN C. MONTGOMERY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06-30071-DRH—**David R. Herndon**, *Chief Judge.*

ARGUED DECEMBER 12, 2008—DECIDED FEBRUARY 13, 2009

Before CUDAHY, FLAUM, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* A federal jury convicted Calvin Montgomery of being a felon in possession of a firearm. Montgomery now appeals the district court's denial of his motion to suppress his statement implicating himself for that crime. He argues that his statement was involuntary because it was given in response to promises of leniency, invoking a supposed per se rule prohibiting the police from making promises to a suspect in order to extract a confession. Alternatively, Montgomery argues

that his statement was involuntary under a totality of the circumstances approach. He also argues that the police failed to honor his right to silence and to cut off questioning.

For the following reasons, we affirm the district court's denial of the motion to suppress.

## I. Background

In the early morning hours of April 13, 2004, Aubrey Keller of the East St. Louis Police Department made a traffic stop of the car that Montgomery was riding in. Montgomery, without being told to do so, got out of the car and dropped something (Keller claimed it sounded like a beer bottle) on the ground. When Keller demanded that Montgomery make his hands visible, Montgomery began turning towards Keller and then dropped a second object on the ground. From the sound that second object made, Keller surmised that it was a gun. Keller then saw Montgomery kick at the second object, and Keller then heard the sound of the gun skittering across the pavement, and saw it stop on the ground near the driver's side of the car. Keller arrested Montgomery and took him to the East St. Louis police station, booking him for unlawful use of a weapon by a felon. Keller testified in later proceedings that during the course of his contact with appellant, Montgomery did not appear to be drunk or under the influence of drugs, and in fact that Montgomery executed the turn-around-while-kicking-the-gun maneuver without having any problems with his balance.

## A.  First police interview

Later that morning, Marion Riddle, a detective with the East St. Louis police department, attempted to interview Montgomery. Riddle gave Montgomery a form containing the standard *Miranda* warnings and had Montgomery sign the form to indicate that he understood his rights. Montgomery then told Riddle he did not wish to give a statement, and Riddle ended the interview. The interview was not videotaped, and Riddle later testified that police department policy at that time did not require officers to videotape all interviews. This first interview, which began a little after 8:00 on the morning of October 13, ended by about 8:10.

## B.  Roll call room discussion

Riddle informed Desmond Williams, another detective with the East St. Louis Police Department, that Montgomery did not wish to make a statement. Riddle also told Williams that, based upon the information they had on hand, Montgomery may have been a felon in possession of a firearm, and thus subject to federal criminal charges. Williams then called in Paul Heiser, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to assist with Montgomery's case. Heiser went to the police department building, where Williams briefed him on the case and ran Montgomery's criminal history through a database. Heiser, along with Williams, conducted interviews with Sean Bell and Nathaniel Holmes, two other passengers in the car with Montgomery at the time of the traffic stop. Sometime between 2:30 and 3:00,

Heiser and Williams then went down to the department's jail, where Montgomery was present in a cell with some of the other people arrested during that morning's traffic stop. Because they could not speak to him with his cellmates present, Williams and Heiser walked Montgomery up to the roll call room at the station.

Williams introduced Heiser to Montgomery and explained why he was in the police station. Williams said that they wanted to talk to Montgomery, but not directly about the facts of his case. Heiser testified that the discussion touched on Montgomery's marital problems and his drinking, and Montgomery also asked why federal authorities were getting involved. The two investigators claimed that because they did not intend to speak with Montgomery about the specifics of his case, they did not give him a set of *Miranda* warnings before this discussion.

When Heiser told Montgomery that he was present at the station because the police had reviewed his criminal history report and suspected he was a felon in possession of a firearm, Montgomery told the two investigators, "Well, that's not my firearm." Heiser responded that the other two passengers in the car had given statements, and that the police would examine the gun for fingerprints and would trace the gun back to Montgomery if they found his fingerprints on it. Montgomery again said that the weapon was not his, and Heiser said that if Montgomery wanted to "explain [his] side of the story," Heiser could take him upstairs, advise him of his rights, and let him give a statement.

During this conversation in the roll call room, Montgom-ery asked Heiser what sort of jail time he could expect if the case went federal. Heiser replied that the statutory maximum was ten years. (Heiser claims that he was unaware at this time that Montgomery would be sen-tenced under an Armed Career Criminal provision of the sentencing guidelines, resulting in a longer prison sen-tence than ten years.) Montgomery told Heiser, "I don't want ten years." After some additional back-and-forth on the consequences of state versus federal charges, Mont-gomery agreed to accompany the officers upstairs for a videotaped interview.

## C.  Formal statement

Around 4:00 pm, Heiser, Williams, and Montgomery went upstairs from the roll call room to a police interview room in order to give a videotaped statement. Heiser testified at the suppression hearing that Montgomery did not have any trouble navigating his way upstairs, nor did he look drunk, sleepy, or in any other way impaired during this time.

As the interview began, Heiser placed an ATF Advice of Rights form in front of Montgomery. Montgomery immediately noticed that the ATF form was different from the form he had signed earlier that day in his inter-view with Riddle. To show the basic similarity of the forms, Williams left the room to retrieve an East St. Louis Police Department advice of rights form. The videotape in the interview room continued to roll when Williams left. Heiser asked Montgomery to give him his address

and a few other personal details. Montgomery asked Heiser if Bell and Holmes, the other two passengers in the car, also had to give statements. Heiser, evidently thinking that Montgomery had asked *whether* the two had given statements, not if they *had* to give statements, replied that they did.

Montgomery continued to express his puzzlement about why his case had to go federal, asking Heiser, "Can't you just help me?" Heiser told Montgomery in response, "I'm helping you more than you know." Heiser testified at the suppression hearing that he meant to say that he was helping Montgomery by bringing charges against him. If Montgomery took advantage of the substance abuse treatment and vocational training available to him in prison, he would be able to turn his life around; Heiser did not offer this more fulsome explanation to Montgomery, however. Montgomery again asked Heiser why the case couldn't just be a state case, and Heiser told him, "It is what it is and it can't be unraveled."

Taking a different tack, the interview video then showed Heiser telling Montgomery, "Think positive. You're looking at every negative thing about this." Heiser clarified this statement during his testimony at the suppression hearing as well, stating that he meant that Montgomery should be glad that neither he nor anyone else was hurt, despite the fact that he had a gun in his possession during a traffic stop by a police officer. Montgomery again told Heiser, "I don't want a federal case," and Heiser this time told him, "The state could be worse." Heiser testified at the suppression hearing that in his experience

as an investigator, state penalties for unlawful possession of a firearm could be worse than federal penalties. Then, in reference to the prison sentence that Montgomery faced in the federal system, Heiser added, "[w]ell, if you get time, you're not going to get 10 years." Heiser made this statement based on his knowledge of Montgomery's criminal history, but as with the statement in the roll call room, he apparently did not know that Montgomery would qualify as an Armed Career Criminal and that Montgomery instead faced a mandatory minimum sentence of fifteen years.

Immediately following this comment, Williams returned with the East St. Louis advice of rights form. Williams told Montgomery to initial each line of the form if he understood the accompanying right. Williams advised Montgomery that he had the right to remain silent. Montgomery then asked the officers if he had to talk to them if he initialed the form. Williams told him that he had to initial the form to indicate that he understood his rights whether he wanted to talk to them or not, and that initialing the form did not mean that he had to talk to the investigators.

After signing the form, Montgomery asked if he was doing something to incriminate himself. Heiser then produced the advice of rights form again and directed Montgomery to the portion of the form telling him that anything he said to the police could be used against him in court. Montgomery then asked the investigators whether he could speak to a lawyer if he chose not to say anything. They responded that he could. Montgomery

then asked whether things would be worse if he chose to talk to a lawyer. The investigators responded that they could not say what it would do, and that giving a statement would just give him an opportunity to tell his side of the story.[1] Montgomery then agreed to go ahead, and gave a statement of approximately thirty minutes. He told the investigators that he and the other occupants of the car had been drinking and smoking marijuana prior to the traffic stop, and that his fingerprints were on the weapon dropped at the scene because the other passengers had given him the gun to get rid of, and that he threw it out the window.

Heiser and Williams both testified at the suppression hearing that Montgomery did not appear to be drunk or under the influence of drugs at the time of their interview, nor did he appear to be tired, sleepy, or otherwise impaired. The district court's ruling on Montgomery's suppression motion found that he was coherent during

---

[1] Montgomery argues in his appellate briefs that Heiser and Williams purposely minimized the importance of counsel by telling Montgomery that invoking his right to counsel would just give him a chance to tell his side of the story (in essence, that counsel would only act as a sounding board for Montgomery's version of events). The district court found at the suppression hearing, however, that when the investigators referred to Montgomery's ability to tell his side of the story they were referring to the opportunity to give a statement, not his opportunity to speak to counsel. The statement is slightly ambiguous but because the finding is not clearly erroneous, we will not disturb this finding on appeal.

the course of the interview and was not intoxicated or under the influence of drugs when he was advised of his *Miranda* rights.

The district court denied Montgomery's motion to suppress his statement on October 31, 2007, holding that Montgomery's statement to law enforcement officers was voluntary and made after a knowing and voluntary waiver of his *Miranda* rights. Montgomery then pled guilty to the charge of unlawful possession of a firearm by a previously convicted felon, reserving the right to appeal the suppression of his statement. The district court sentenced Montgomery to 188 months' imprisonment, five years' supervised release, and ordered him to pay a fine and special assessment. This appeal followed.

## II. Discussion

When reviewing a motion to suppress, we review questions of law de novo and questions of fact for clear error. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). The voluntariness of a confession is a matter of law that we review de novo. *United States v. Gillaum*, 372 F.3d 848, 855 (7th Cir. 2004).

Montgomery raises three challenges to his statement. First, he claims that Heiser and Williams induced his statement with false promises of leniency; second, he claims that the statement was not voluntary under the totality of the circumstances; and third, he claims that the police did not scrupulously honor his invocation of his right to remain silent in his first interview with Riddle. We take each point in turn.

**A. False promises of leniency**

Montgomery first argues that his statement was induced by false promises of leniency from Heiser. Montgomery is specifically referring to Heiser's assurances that he would not receive a ten year sentence in the federal system. The district court found that the promises were not objectionable because there was no misrepresentation and because, even assuming that there was a misrepresentation, Heiser's speculation about sentencing was not enough to make the statement involuntary.

A confession is involuntary if it is the result of coercive police conduct. *See Gillaum*, 372 F.3d at 856. The use of deceit to obtain a confession does not make the confession involuntary as long as the police interrogation was not coercive. *See Sotelo v. Indiana State Prison*, 850 F.2d 1244, 1251 (7th Cir. 1988). As a fundamental matter, a confession must be voluntary under the totality of the circumstances, and a court evaluating the voluntariness of a confession must consider any promises or representations made by interrogating officers. *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994); *Holland v. McGinnis*, 963 F.2d 1044, 1050-52 (7th Cir. 1992).

Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him. *See United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir. 1994) (A confession is considered voluntary if the state demonstrates that it " 'was not secured through psychological or physical intimidation but rather was

the product of a rational intellect and free will.'") (quoting *United States v. Haddon*, 927 F.2d 942, 945 (7th Cir. 1991)). "[A]n empty prosecutorial promise could prevent a suspect from making a rational choice by 'distorting the alternatives among which the person under interrogation is being asked to choose.'" *Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir. 1996) *(*quoting *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir. 1989)); *see also United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995) (generally, false promise of leniency made in order induce a confession is a forbidden tactic).

The parties agree that Heiser told Montgomery that if he was sentenced to prison time on the federal charges he would not get ten years. However, as the testimony at the suppression hearing bore out, those proclamations were not tied to any confession or statement on Montgomery's part. Heiser did not promise Montgomery that he would not receive a ten year sentence *if he confessed*; he said that Montgomery would not receive ten years from the federal system.[2] Montgomery frequently raised concerns about being tried on federal charges rather than state charges, and Heiser told him (incorrectly, it turned out) that the most he could expect for federal felon-in-posses-

---

[2] Heiser was asked on re-direct examination if his statement that "you're not going to get ten years" was linked to Montgomery's cooperation, and Heiser testified that it was not. Other testimony indicates that the statement was based on Heiser's confusion about the maximum statutory penalty, not about any deal that he planned to arrange with the U.S. Attorney's Office if Montgomery gave a statement.

sion charges was ten years. The information that Heiser gave him was inaccurate, but Montgomery was not promised a ten year sentence if he confessed or made a statement. This court has previously acknowledged that an illusive promise of leniency in exchange for a confession presents "a difficult case." *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001). The mere fact that Heiser misstated the potential sentences in the federal system does not make the interrogation coercive, however, especially when the purported sentence was not linked to Montgomery's willingness to talk to the investigators. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police misrepresentation of another suspect's statement was relevant to voluntariness of confession, but insufficient to make the confession involuntary); *Sotelo*, 850 F.2d at 1251 ("deception by an interrogator does not automatically invalidate a confession").

Montgomery contends that this case should be decided under a per se rule of suppression derived from *Bram v. United States*, 168 U.S. 532 (1897). The Supreme Court held in *Bram*, citing various common law authorities, that a confession procured "either by flattery or hope . . . however slightly the emotions may be implanted, is not admissible evidence; for the law will not suffer a prisoner to be made the deluded instrument of his own conviction." *Id.* at 547. This particular statement, which was not a statement by the Court but rather a quotation from a treatise cited in the opinion's review of common law sources, is one that criminal defendants frequently use to support a broad reading of the case creating a requirement of per se reversal if investigators made any sort of

promise at all to a suspect prior to a confession. *See United States v. Long*, 852 F.2d 975, 980 (7th Cir. 1988) (Easterbrook. J., concurring) ("*Bram* has not excluded a confession in decades; it is a derelict, offering false hope to suspects and vexing judges who must distinguish it on the way to decisions reached on other grounds. It is a source of pointless litigation . . ."). Indeed, *Bram*'s statement that "[t]he law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted," *Bram*, 168 U.S. at 565, is inconsistent with the current totality of the circumstances approach. *See Frazier*, 394 U.S. at 739.

This circuit has not read *Bram* as creating a per se rule requiring suppression whenever a promise or inducement is made to a suspect. *Long*, 852 F.2d at 977; *see also United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995). Montgomery's reading of *Bram* was decisively rejected by the Supreme Court in *Arizona v. Fulminante*, 499 U.S. 285 (1991), when the Court stated that *Bram* "under current precedent does not state the standard for determining the voluntariness of a confession . . ." *Id.* at 285. Montgomery objects that the Supreme Court cited no authority for its abandonment of *Bram*, but the Court's statement about *Bram* came in the context of a discussion of the state supreme court's decision on Fulminante's case, including that court's citations to the modern case law establishing the totality of the circumstances as the relevant test. *Id.* at 285-86. And, in any event, the Supreme Court does not need to cite authority when revising or limiting its own case law.

Montgomery then claims that *Bram* was revived by the Supreme Court's recent decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). *Heller* struck down Washington D.C.'s handgun ban because it was inconsistent with the original understanding of the Second Amendment. The opinion in *Heller* also took issue with a dissenting opinion's use of *United States v. Miller*, 307 U.S. 174 (1939), since that opinion did not purport to be a thorough discussion of the history of the Second Amendment. *Heller*, 128 S. Ct. at 2815. Montgomery now claims that the originalist opinion in *Heller* revived opinions such as *Bram*, which he claims was a thorough history of the Fifth Amendment in contrast to *Fulminante*, and thus overrules *Fulminante* or limits its application to Fourteenth Amendment Due Process Clause cases. (The latter, we note, is an odd suggestion that would seriously undermine the jurisprudence incorporating the Fifth Amendment through the Due Process Clause.) To the extent that Montgomery believes that *Heller* adopts a new canon of constitutional interpretation for amendments wholly separate from that discussed in the case, and that it overrules or limits unrelated lines of case law *sub silentio*, we decline to read that much into the opinion and do not find it controlling on the issues presented.

In short, while Heiser was mistaken about the prison sentence that Montgomery faced in the federal court system, his statements that Montgomery would not serve ten years pursuant to federal charges was not made in order to induce a confession. We agree with the district court that Montgomery did not make an involuntary statement in response to them.

**B.  Voluntariness under the totality of the circumstances**

Montgomery makes a number of points in an effort to show that his statement was involuntary under the totality of the circumstances. He states that Heiser incorrectly informed him that other passengers in the car *had* to give statements, when in reality neither had, and falsely claimed his prints were found on the gun. He also cites the investigators' claim that it was a possibility that federal charges may not have been brought if Montgomery had given a statement to Riddle earlier that day, and argues that the investigators wanted to give Montgomery the impression that he was hurting himself by refusing to speak to them. He acknowledges that the investigators told him he could speak with a lawyer, but says they should have told him the interview would terminate if he requested to speak with a lawyer. He also states that the procedure of having him read and initial an advice of rights form undermined the significance of the procedure. Finally, he cites his borderline intelligence and claims that this places him in the low borderline range of intellectual abilities, and thus made him more susceptible to police coercion.

This court has held that "[a] confession is voluntary if, in the totality of circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.' " *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). Finding that the police engaged in coercive

activity is a necessary predicate to finding that a suspect's confession was involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). We determine whether police conduct was coercive by examining factors such as "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention, the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Huerta*, 239 F.3d at 871.

As we explained above, we do not find that the investigators promised a lighter sentence or more favorable treatment in exchange for a confession or statement from Montgomery. Montgomery does not claim that he suffered any kind of physical punishment or coercion, or that the investigators deprived him of food or sleep prior to the interviews. With respect to Heiser's incorrect answer to Montgomery's question about whether the other passengers in the car "had" to give a statement, that would not overbear Montgomery's free will. Montgomery had already been advised of his right not to give a statement earlier that day in his meeting with Riddle, and was once more advised of his right not to speak to the investigators prior to giving his videotaped statement. Montgomery's decision not to speak to Riddle earlier that day, and his back-and-forth with Heiser and Williams on his right to remain silent prior to giving the videotaped statement, demonstrate that he understood this right.

The mere fact that Heiser was wrong when he stated that the two other suspects had given statements would

not render Montgomery's statement involuntary, either. Heiser did not say that those statements implicated Montgomery, and the district court did not find any effort "rising to the level of trickery." Even if Heiser had told Montgomery that the other passengers implicated him, there is no rule finding such conduct necessarily coercive. In fact, precedent holds that a police officer may "actively mislead" a suspect prior to obtaining a statement or confession so long as a rational decision remains possible. *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990); s*ee also United States ex rel. Hall v. Director, Dep't of Corrections*, 578 F.2d 194 (7th Cir. 1978) (no *ipso facto* coercion when police told a suspect, wrongly, that co-defendants had implicated him as the ringleader). In this case Montgomery was fully advised of his rights prior to making a statement, and any belief that his two fellow passengers had also spoken to the police would not prevent him from making a rational decision about his options.

Heiser and Williams' statements that an earlier statement may have kept the case at the state level, and that they could not say what a lawyer's presence would effectuate were not false promises of leniency in exchange for cooperation nor even really deceptive. Both statements were non-committal. While they may not have fully apprised Montgomery of the legal landscape, such omissions are not inherently coercive behavior on the part of the police.

The government acknowledges that Montgomery has borderline intelligence, but this factor alone does not result in a finding of coercion. At the time of his arrest,

Montgomery was approximately forty years old and had prior experience with the criminal justice system. He appeared well aware of what was going on throughout the questioning: He understood the difference between the federal and state criminal justice system, he understood that he did not need to give a statement in his interview with Riddle, and in fact did not; and he noticed the differences between the two advice of rights forms he was asked to sign. Perhaps most significant of all, he asked relevant questions about his rights prior to giving his statement to the officers. While we take account of Montgomery's intelligence when determining whether his statement was voluntary, we do not find that it fatally affected the statement in this case.

Finally, we note that the district court found no evidence that Montgomery was intoxicated, exhausted or otherwise incapacitated. The witnesses at the suppression hearing, from Keller to Riddle to Williams and Heiser, all testified that Montgomery was coherent and did not appear to be intoxicated or sleep deprived. While he and the other occupants of the car were, according to statements, drinking and smoking marijuana prior to Keller's traffic stop, this behavior apparently did not affect his choice to give a statement.

In light of the totality of the circumstances, we concur with the district court that Montgomery made a rational choice to give a statement to Williams and Heiser and that his statement was not involuntary or the result of police coercion.

## C. Scrupulously honoring Montgomery's right to cut off questioning

Montgomery's last argument is that the investigators did not scrupulously honor his invocation of his right to remain silent. In *Michigan v. Mosley*, 423 U.S. 96 (1975), the Supreme Court held that the admissibility of statements obtained after a defendant invokes his right to remain silent is dependent on whether the defendant's right to cut off questioning was "scrupulously honored." 423 U.S. at 103. The Court set forth several nonexclusive factors to determine whether interrogation was properly resumed. *Id.* These factors include "an inquiry into the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new *Miranda* warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *United States v. Schwensow*, 151 F.3d 650, 658 (7th Cir. 1998) (citing *Mosley*, 423 U.S. at 104-05); *accord United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004). In *Schwensow*, after the defendant invoked his right to remain silent, officers later questioned him about the same crime. *Schwensow*, 151 F.3d at 659. We held that "the constitutionality of a subsequent police interview depends not on its subject matter but rather on whether the police, in conducting the interview, sought to undermine the defendant's resolve to remain silent." We concluded that such an approach "naturally follows from *Mosley*" because *Mosley* did not elevate "any one factor as predominant or dispositive nor suggest[] that the enumerated factors are exhaustive." *Id*.

Montgomery invoked his right to remain silent in his interview with Riddle, and questioning then ceased. However, later in the roll call room Heiser and Williams spoke to Montgomery without re-appraising him of his *Miranda* rights. Ostensibly, the investigators did not intend to question Montgomery about the specifics of his case. Heiser did, however, state that he was at the police station because it appeared that Montgomery was a felon in possession or a firearm. He also told Montgomery that the gun would be tested for fingerprints and that Montgomery's prints might be on it (in which case the charges would come back to him). Eventually, Montgomery agreed to give a statement, was given a second set of *Miranda* warnings, and then gave a videotaped statement in which he discussed his possession of the gun.

The defendant admits that the facts of this case are very similar to *United States v. Wyatt*, 179 F.3d 532 (7th Cir. 1999). In that case, defendant invoked his right to remain silent and the police ceased questioning him. However, after several hours passed the officers confronted the defendant again and outlined the evidence against him. The defendant then agreed to make a statement, and gave one after a second round of *Miranda* warnings. We noted that the officers' discussion of the evidence against the defendant, before the second round of warnings, was a "misstep," but was not by itself a violation of *Mosley*. *Id.* at 538. We also rejected defendant's contention that *Mosley* requires officers to restrict renewed interrogation to crimes unrelated to those a suspect had earlier refused to discuss. Rather, as we stated in *Schwensow*, the test was not the subject matter but whether the police

sought to undermine the suspect's resolve to remain silent. This test accords with the broader purpose of the Supreme Court's opinion in *Mosley.* That opinion sought a middle ground between, on the one hand, a blanket immunity from further custodial questioning by any officer on any subject once a suspect has invoked the right to silence, and, on the other hand, repeated rounds of interrogation with only momentary respites when a suspect breaks off questioning. *See Mosley*, 423 U.S. at 102-03.

Like *Wyatt*, in this case two factors weigh in favor of suppression: The officers outlined the evidence against Montgomery before giving him renewed *Miranda* warnings, and the discussion involved the same crime as Montgomery's first interview with Riddle. We conclude that these factors are insufficient to require suppression. When Heiser questioned Montgomery in the roll call room, he tried to limit the subject matter by stating that he did not want to discuss the facts of Montgomery's case. Outlining the evidence against Montgomery (or discussing such evidence hypothetically, in the case of the fingerprint evidence) was a misstep, similar to the misstep in *Wyatt*. The possibility of Montgomery giving a statement, however, arose only because Montgomery volunteered the information that the gun did not belong to him.

Montgomery argues that the police conduct in this case was worse than the conduct in *Wyatt* because here, unlike in *Wyatt*, the police waited until Montgomery was upstairs in an interview room before giving him a second set of *Miranda* warnings. We do not see anything suspi-

cious in the timing of the warnings. Montgomery did receive a second set of *Miranda* warnings before giving his videotaped statement and the lapse in time between the end of the discussion in the roll call room and the second set of warnings in the interview room may well have been to Montgomery's benefit, as it would give him time to collect himself and consider whether he wanted to give a statement before committing to doing so. While the police work in this case was not exemplary, the circumstances do not suggest that the investigators attempted to undermine Montgomery's resolve to remain silent. Montgomery's right to cut off questioning was respected, and he was apprised of his rights before giving a statement. We find no violation of *Mosley*, and no basis for suppressing the statement.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling on the motion to suppress.