In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 22-2968

JOHNNIE MERTICE WESLEY,

*Petitioner-Appellant,*

*v.*

RANDALL HEPP,

*Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:18-cv-52-pp — **Pamela Pepper**, *Chief Judge.*

_____

ARGUED SEPTEMBER 19, 2023 — DECIDED JANUARY 5, 2024

_____

Before EASTERBROOK, WOOD, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* On February 6, 2014, Wisconsin police brought Johnnie Wesley in for questioning related to an ongoing murder investigation. During an initial interrogation, Wesley invoked his right to remain silent, and the interrogation ceased. Nine hours later, officers attempted to interrogate Wesley a second time; again, he indicated he did not wish to speak. On February 7, officers interrogated Wesley a third time. During that interrogation, Wesley made these

statements: (1) "Ain't nothing to talk about doe."; (2) "I ain't got shit to say about no homicide."; and (3) "Can I go back to my cell now?" Later, during the same interrogation, Wesley made incriminating statements implicating himself in the homicide. After the State of Wisconsin charged Wesley with felony murder, he moved to suppress the incriminating statements on two grounds. First, he argued that the officers did not scrupulously honor his initial invocation of his right to remain silent. Second, he argued that he unequivocally invoked his right to remain silent during the third interrogation. The trial court denied his motion, the Wisconsin Court of Appeals affirmed, and the Wisconsin Supreme Court denied Wesley's petition for review. Wesley then petitioned for a writ of habeas corpus in the Eastern District of Wisconsin. His petition was dismissed, and this appeal followed. Because the Wisconsin Court of Appeals reasonably applied Supreme Court precedent to Wesley's case, we affirm.

I

Wisconsin police took Johnnie Wesley into custody on February 5, 2014, in connection with the murder of Bruce Lloyd. The next day, around 11:43 am, Detective Katherine Spano interrogated Wesley. Detective David Dalland was also present, though he did not ask any questions. After a brief back-and-forth, the following exchange occurred:

> SPANO: Okay—so you don't want to talk to me right now?
>
> WESLEY: About no murder no.
>
> SPANO: You don't want to hear the facts or the story—
>
> WESLEY: About no murder no—

> SPANO: —or the reasons of why we believe you were responsible?
>
> WESLEY: No.

The interrogation ended shortly after this exchange; *Miranda* warnings were not given.

Approximately nine hours later, at 9:27 pm, Detective Kevin Klemstein tried to interrogate Wesley a second time, but Wesley still did not wish to speak. That interrogation did not proceed.

On February 7, at around 2:50 pm, Detective Dalland, who was present but silent at the first interrogation, and Detective Kent Corbett initiated a third interrogation with Wesley. Before giving *Miranda* warnings, the following conversation took place:

> DALLAND: Look, listen, let me get through what I need to do first and then we can talk if that's what you want. Okay. Is that fair?
>
> WESLEY: *Ain't nothing to talk about doe.* That's what I'm sayin. Ya'll steady questioning me about nothing I don't know nothing about. I don't do nothing. I sit in the house all day. I don't do nothing.
>
> DALLAND: And if that's what you want to tell me, then that is your right and I am going to listen. Okay. But like I said, I have our little rules that we have to go by okay?
>
> WESLEY: yea … I feel where you coming from and all but shit.

*Miranda* warnings were then given, and the interrogation continued. Detective Dalland tried to discuss the homicide with Wesley:

> DALLAND: Having those rights in line is it okay if we—
>
> WESLEY: Ughh—you can say—
>
> DALLAND: —exchange information? Now can I ask you questions?
>
> WESLEY: You can say what you want but it just, *I ain't got shit to say about no homicide*. I don't kill people. I never attempted to kill nobody I never … I don't do that. I'm not that type of person. I just lost my momma November 7.
>
> DALLAND: And I am sorry for your loss.
>
> …
>
> DALLAND: Well, you can pick and choose whatever you choose to respond to, and what you don't want to respond to. I am asking for a yes or no. Do you—are you—
>
> WESLEY: I ain't got shit to talk about no homicide because I ain't know nothing about it. That's why I'm telling you now. You asking me questions about this homicide case I know nothing about it officer.
>
> DALLAND: Okay.
>
> WESLEY: Honest to God truth I don't know nothing.

Upon further questioning, Wesley continued to deny involvement in Lloyd's death but admitted he had bought marijuana from Lloyd months earlier. Detective Corbett then took charge of questioning and indicated that he had evidence connecting Wesley to the murder, which led to the following exchange:

> WESLEY: I don't know—that's why I'm trying to tell ya'll I don't know shit about shit—I been telling ya'll that for two days I don't know. All I know is ya'll got the wrong person. I still ain't got my Newport—and we've been sitting here talking for at least 30 minutes. Chips and water but no Newport.
>
> CORBETT: You're two up on me. I don't have water or chips.
>
> [four to five seconds of silence]
>
> WESLEY: *Can I got* [sic] *back to my cell now?*
>
> CORBETT: Is that really going to help you?
>
> WESLEY: Is me telling ya'll something I don't know going to help me? Well, it isn't going to help me. But me finding some information can that help me?

Eventually, Detective Dalland kept questioning Wesley, asking him if he had planned to rob or shoot someone the night of Lloyd's death. Wesley admitted that he had attempted to rob Lloyd at gunpoint, that Lloyd tried to wrestle the gun away from Wesley, and that Lloyd was shot during the struggle.

Based on these admissions, the State of Wisconsin charged Wesley with one count of felony murder. Wesley moved to suppress his admissions, arguing that (1) his initial invocation of silence was not scrupulously honored, see *Michigan v. Mosley*, 423 U.S. 96 (1975), and (2) he unequivocally invoked his right to remain silent during the third interrogation, see *Berghuis v. Thompkins*, 560 U.S. 370 (2010). After the trial court denied Wesley's motion, he pleaded guilty. The Wisconsin Court of Appeals affirmed his conviction, *State v. Wesley*, 371 Wis. 2d 563 (Wis. Ct. App. 2016), and the Wisconsin Supreme Court denied his petition for review.

Pursuant to 28 U.S.C. § 2254, Wesley petitioned for a writ of habeas corpus. The district court denied Wesley's petition but granted a certificate of appealability. This appeal followed.

## II

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may issue writs of habeas corpus for petitioners in state custody. *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015). "A petitioner in state court custody is entitled to a writ of habeas corpus 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Pruitt v. Neal*, 788 F.3d 248, 262–63 (7th Cir. 2015) (quoting 28 U.S.C. § 2254(a)). A federal court may grant a habeas application with respect to claims adjudicated on the merits only if a state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding," *id.* § 2254(d)(2). In his petition, Wesley only brings constitutional challenges under § 2254(d)(1).

While we review a district court's denial of a § 2254 petition de novo, "we review the decision of the last state court to address the merits of the petitioner's claim … with deference." *Pruitt*, 788 F.3d at 264 (citation omitted). That deference is substantial. "To grant the petition, we must conclude that the state court unreasonably applied Supreme Court precedent, not our own." *Flint v. Carr*, 10 F.4th 786, 796 (7th Cir. 2021) (citation omitted). The petitioner must show "far more than that the state court's decision was merely wrong or even clear error." *Smith v. Boughton*, 43 F.4th 702, 708 (7th Cir. 2022) (cleaned up). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Simply put, § 2254 provides relief only when the state court's holding was objectively unreasonable. *Smith*, 43 F.4th at 708 (noting that a state court errs only when no "fair-minded jurists" could disagree that the state court's decision conflicted with Supreme Court precedent).

Wesley's petition argues that the Wisconsin Court of Appeals misapplied two Supreme Court cases: (1) *Michigan v. Mosley*, 423 U.S. 96 (1975), and (2) *Berghuis v. Thompkins*, 560 U.S. 370 (2010). We address each argument in turn.

A

Wesley first asserts that his right to remain silent was not scrupulously honored after he invoked it during the first interrogation. In *Mosley*, the Supreme Court "held that the admissibility of statements obtained after a defendant invokes his right to remain silent is dependent on whether the defendant's right to cut off questioning was 'scrupulously honored.'"

*United States v. Montgomery*, 555 F.3d 623, 633 (7th Cir. 2009) (quoting *Mosley*, 423 U.S. at 103). The Supreme Court did not lay out explicit factors for this determination, but courts across the country have extrapolated their own non-exhaustive factors based on the facts and reasoning of the case. See, e.g., *United States v. Alvarado-Saldivar*, 62 F.3d 697, 699 (5th Cir. 1995); *Davie v. Mitchell*, 547 F.3d 297, 310 (6th Cir. 2008).

To be sure, no single multifactor test reigns supreme. Rather, *Mosley* is best understood to have created "a totality of the circumstances test for determining whether police have breached their duty to honor a suspect's right to remain silent." *Easley v. Frey*, 433 F.3d 969, 972 (7th Cir. 2006). In our circuit, for example, we consider four factors: "[(1)] the amount of time that lapsed between interrogations; [(2)] the scope of the second interrogation; [(3)] whether new *Miranda* warnings were given; and [(4)] the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *Montgomery*, 555 F.3d at 633 (quoting *United States v. Schwensow*, 151 F.3d 650, 658 (7th Cir. 1998)). On the other hand, Wisconsin courts use a multifactor test that, while similar to our own, has additional considerations: (1) whether the original interrogation was promptly terminated; (2) whether the interrogation resumed only after the passage of a significant period of time; (3) whether the suspect was given complete *Miranda* warnings at the outset of the second interrogation; (4) whether a different officer resumed the questioning; and (5) whether the second interrogation was limited to a crime that was not the subject of the earlier interrogation. *State v. Hartwig*, 366 N.W.2d 866, 869 (Wis. 1985).

Wesley does not challenge the legal validity of Wisconsin's multifactor test, nor could he. Under § 2254, the state court

need only apply Supreme Court precedent reasonably. State courts may adopt their own multifactor tests based on that precedent, so long as the test accurately reflects the law; here, it does. The test is both consistent with *Mosley*'s holding and reflects the totality of the circumstances the Court considered in that case. Accordingly, in analyzing whether the Wisconsin Court of Appeals reasonably applied *Mosley*, we rely on Wisconsin's test. See, e.g., *Renico v. Lett*, 559 U.S. 766, 778–79 (2010) (noting that the circuit court erred when it evaluated the reasonableness of the state court's application of Supreme Court precedent through the lens of the circuit's own three-factor test, when the Supreme Court case "nowhere established [those] three factors as a constitutional test").

First, Wesley's initial interrogation was promptly terminated after he invoked his right to remain silent. Wesley argues that *Miranda* warnings were not given before the first interrogation, but that is not pertinent to the first factor. That is, our *Mosley* factors, as well as Wisconsin's, only focus on whether *Miranda* warnings were given in the subsequent interrogation. Here, Detective Spano gathered some logistical information from Wesley in an initial interrogation, Wesley quickly invoked his right to remain silent, and the interrogation ceased. That is all the first factor contemplates.

Second, there was a significant lapse of time between the interrogations. Wesley believes his right to remain silent was not scrupulously honored because he was interrogated three times in less than thirty-six hours. This is hardly unreasonable. Less than three hours passed between the first and second interrogations in *Mosley*, yet the Supreme Court found that time lapse sufficient. 423 U.S. at 104–06. Here, nine hours elapsed between the first and second interrogations, and

approximately seventeen hours elapsed between the second and third interrogations. It was not unreasonable for the Wisconsin Court of Appeals to find a sufficient lapse in time between interrogations.

Third, *Miranda* warnings were given before the third interrogation. Wesley does not dispute this fact.

Fourth, a different officer conducted the questioning in the third interrogation. Detective Dalland conducted the third interrogation, while Detective Spano conducted the first interrogation (Detective Klemstein conducted the brief second interrogation, which is not challenged). Wesley objects to Detective Dalland's presence at the first interrogation, even though he did not speak. However, he points to no law suggesting that the mere presence of an officer at both interrogations contravenes the holding in *Mosley*. Indeed, the Court in *Mosley* found no constitutional violation in part because Mosley "was *questioned* by another police officer." *Id.* at 104 (emphasis added). The Wisconsin Court of Appeals' focus on the officers conducting the questioning, rather than the other officers present, does not rise to an objectively unreasonable application of this precedent to these facts, particularly because *Mosley* does not create a firm rule on the issue. See *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (noting that in habeas cases, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

Fifth, the subject matter of the third interrogation was the same as that of the first: Lloyd's murder. Thus, the fifth factor favors Wesley. However, we have held that "the constitutionality of a subsequent police interview depends not on its subject matter but rather on whether the police, in conducting the interview, sought to undermine the suspect's resolve to

remain silent." *Schwensow*, 151 F.3d at 659. "Such an approach naturally follows from *Mosley* because *Mosley* did not elevate any one factor as predominant or dispositive nor suggest that the enumerated factors are exhaustive." *Montgomery*, 555 F.3d at 633 (cleaned up). Thus, while the fifth factor favors Wesley, it is not conclusive.

Looking at the totality of the circumstances, and noting that most factors favored the state, the Wisconsin Court of Appeals determined that the officers did not seek to undermine Wesley's right to remain silent. Based on the facts of the case and the considerations supplied in *Mosley*, this conclusion was not objectively unreasonable.

B

The Wisconsin Court of Appeals also reasonably applied Supreme Court precedent in finding that Wesley did not unequivocally invoke his right to remain silent during the third interrogation. In *Berghuis v. Thompkins*, the Supreme Court concluded that an individual seeking to invoke the right to remain silent must do so "unambiguously." 560 U.S. 370, 381 (2010). Courts applying this standard have looked for simple, unambiguous statements showing that the suspect wished to end interrogation. See, e.g., *United States v. Abdallah*, 911 F.3d 201, 211–12 (4th Cir. 2018) (finding the defendant's statement that he "wasn't going to say anything at all" to be an unambiguous invocation); *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011) (same as to, "I have decided not to say any more"); *Jones v. Harrington*, 829 F.3d 1128, 1139–40 (9th Cir. 2016) (same as to, "I don't want to talk no more").

"*Thompkins* also emphasized an important corollary to its clear-invocation rule: if a suspect's attempt to invoke his right

to remain silent is 'ambiguous or equivocal,' the police 'are not required to end the interrogation … or ask questions to clarify' the suspect's intent." *Smith v. Boughton*, 43 F.4th 702, 709 (7th Cir. 2022) (quoting *Thompkins*, 560 U.S. at 381). "The key inquiry, then, is whether a reasonable officer under the circumstances would understand the defendant's statements as an unequivocal invocation of the right to remain silent." *Id.* In applying this standard, courts may look at the statement within the context of the interrogation. *Id.* at 711. But this contextual interpretation "is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987); see also *Smith*, 43 F.4th at 710–11 (noting that courts do not run afoul of *Barrett* if ordinary listeners would need context to understand the meaning of the defendant's words).

Wesley alleges that he unequivocally invoked his right to remain silent during the third interrogation with three separate phrases: (1) "Ain't nothing to talk about doe."; (2) "I ain't got shit to say about no homicide."; and (3) "Can I go back to my cell now?" The Wisconsin Court of Appeals disagreed, and that conclusion was not objectively unreasonable given Supreme Court precedent.

Wesley's first statement, "Ain't nothing to talk about doe," was made right before Detective Dalland read Wesley his *Miranda* rights. At that point, Detective Dalland had only just begun to explain the situation and the underlying murder. While Wesley's statement could mean he wished to no longer speak at all, it also could reasonably be interpreted to mean that he knew nothing about the specific crime, was not responsible for it, and saw no reason for his detention. In fact, his subsequent statements support this latter interpretation:

"That's what I'm sayin. Ya'll steady questioning me about nothing I don't know nothing about. I don't do nothing. I sit in the house all day. I don't do nothing." It was not objectively unreasonable for the Wisconsin Court of Appeals to find Wesley's statement to be merely exculpatory, rather than an invocation of silence.

The second statement arose after *Miranda* warnings were given, when Detective Dalland asked, "Now can I ask you questions?" Wesley responded, "You can say what you want, but it just, *I ain't got shit to say about no homicide*. I don't kill people. I never attempted to kill nobody I never." Like the first statement, Wesley's second statement could reasonably be interpreted as an exculpatory one. When Detective Dalland asked Wesley if he could continue the interrogation, Wesley allowed Dalland to "say what [he] want[ed]." And Wesley's "I ain't got shit to say about no homicide" statement again was at best ambiguous, perhaps indicating a lack of knowledge of and culpability for the specific crime (the homicide), rather than an unequivocal desire to end the interrogation. Again, the Wisconsin Court of Appeals' conclusion that this statement was ambiguous was not objectively unreasonable.

Wesley attempts to show that his first two statements were clear invocations of his right to remain silent by analogizing to the statements made in *Davis v. Greer*, 13 F.3d 1134 (7th Cir. 1994), and *Smith v. Boughton*, 43 F.4th 702 (7th Cir. 2022). However, those cases do not count as clearly established federal law under § 2254. *Glebe v. Frost*, 574 U.S. 21, 24 (2014) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'") (quoting 28 U.S.C. § 2254(d)(1)). Moreover, Wesley's statements critically

differ from those in *Davis* and *Smith*. In *Davis*, we suggested (without deciding) that a suspect's statements of, "I don't want to talk no more," and, "I don't want to talk about it any more," might have invoked his right to remain silent. 13 F.3d at 1138–39. Similarly, in *Smith*, we reviewed whether the statement, "I don't want to talk about this," sufficiently invoked the right to remain silent. 43 F.4th at 710. These statements unambiguously stated, at least in part, "I don't want to talk." Here, Wesley's first two statements equated to, "There is nothing to talk about." This distinction is significant. On the one hand, Wesley could mean that he did not want to talk, as he now argues. But another reasonable inference to draw is that Wesley had nothing to talk about because he was not responsible for and knew nothing about the crime. This is the exculpatory inference that the Wisconsin Court of Appeals reasonably drew based on applicable Supreme Court precedent.

Wesley's third statement—"Can I go back to my cell now?"—fares no better than the previous two. Taken in context, Wesley's inquiry is not an unambiguous assertion of his right to remain silent. The statement gives rise to several competing inferences. Of course, Wesley believes the only reasonable inference is that he invoked his right to remain silent. However, another possible inference based on the plain, ordinary meaning of the statement is that Wesley, after a noticeable five-second pause in questioning, was simply asking if the interrogation was over and if he could return to his cell. The Wisconsin Court of Appeals was not objectively unreasonable in concluding that Wesley did not, through this statement or any other, unambiguously invoke his right to remain silent.

AFFIRMED